KUNDINGER v. CITY OF SAGINAW.                    132    395
                                                 136      5

1. MUNICIPAL CORPORATIONS — PUBLIC IMPROVEMENTS—DECISION
   OF COUNCIL.

   A resolution reciting the intention and understanding of the
   common council of a city that a bill would be introduced in
   the legislature to authorize the issue of bonds to construct a
   bridge, and directing plans and specifications and estimates
   to be made, together with other similar resolutions, is a suffi-
   cient compliance with a charter provision requiring the
   common council to declare by resolution its decision to make
   the improvement.

2. SAME—CONTRACTS—LOWEST BIDDER.

   A charter which authorizes the board of public works to deter-
   mine whether a public improvement shall be done by the city
   or be let by contract, and, if it determines to let it by con-
   tract, directing it to advertise for proposals for furnishing
   materials and performing the work, does not require a con-
   tract to be let to the lowest bidder.

3. SAME.

   Where a city charter does not require the work of constructing
   a public improvement to be let to the lowest bidder, a con-
   tract for building a bridge is not illegal because made in
   pursuance of a resolution of the council requiring each bidder
   to furnish with his proposal a complete plan or drawing
   showing the style and kind of bridge he intended to construct.

4. SAME—AWARDING OF CONTRACT.

   Where a city charter does not require a contract for a public
   improvement to be let to the lowest bidder, the awarding
   of a contract to a bidder is discretionary with the proper
   officials of the city, and their action, taken in good faith, is

5. SAME—INJUNCTION—FRAUD.

   Injunction bills to restrain the completion of public improve-
   ments are not favored where there is no proof of fraud and
   the contract price is not exorbitant.

6. SAME—BOARD OF PUBLIC WORKS—PLANS AND SPECIFICATIONS
   —FINALITY OF ACTION.

   Where a city charter requires the board of public works to

prepare, "so far as necessary, plans and specifications" for public improvements, and its members have exercised their best judgment, and have prepared plans and specifications which bidders can understand, the action of the board is not subject to review in the courts.

7. NAVIGABLE RIVERS—BRIDGES—BOARDS OF SUPERVISORS.
    The authority granted by the board of supervisors to the city of Saginaw in 1891, to construct a bridge across the Saginaw river on Genesee avenue, was sufficient to authorize its construction in 1902.

8. SAME—OBJECTION BY TAXPAYER.
    A taxpayer cannot prevent the construction of a bridge across a navigable river on the ground that it has not been authorized by the board of supervisors.

Appeal from Saginaw; Snow, J. Submitted February 3, 1903. (Docket No. 179.) Decided March 12, 1903.

Bill by Michael Kundinger against the city of Saginaw, William B. Baum, mayor, Alfred Davies, clerk, the board of public works, and the National Bridge Company, to enjoin the carrying out of a contract for the construction of a bridge. From a decree dismissing the bill, complainant appeals. Affirmed.

The undisputed facts as shown by this record are that the Saginaw river, which flows through the city of Saginaw, is a navigable stream, and that the point where Genesee avenue in the city of Saginaw intersects said river is at present occupied by a bridge which has been in use for all the purposes of highway travel, including electric street cars, both city and interurban; that on October 14, 1901, the common council, upon the report of an expert bridge engineer, condemned the bridge as unsafe and unfit for electric street-car traffic, and that from that time to the present time no street cars have run over it, and that the present attempt upon the part of the city authorities is to build a bridge of sufficient capacity to accommodate all highway travel of every kind, and the heavy electric street-railway traffic to which said bridge will be subjected when

completed; that said Genesee avenue is the most important and general thoroughfare in the city of Saginaw; that application was made by the city of Saginaw to the board of supervisors of Saginaw county at its October session, 1891, to construct an iron swing bridge, with two openings, each 75 feet in width in the clear, providing for the passage of vessels and boats navigating said river, and that said permission was granted by the board of supervisors.

On May 21, 1899, the common council of the city approved a bill, by a vote of 28 to 3, to be presented to the legislature, enabling the city to borrow money to construct a bridge. The bill was presented and passed. It reads as follows:

"SECTION 1. That the common council of the city of Saginaw be and it is hereby authorized and empowered to borrow, on the faith and credit of said city, the sum of not exceeding two hundred thousand dollars, for a period of not exceeding twenty years, at a rate of interest not exceeding five per cent. per annum, and to make, execute, negotiate, issue, and sell the bonds of said city therefor, with proper interest coupons attached thereto, in such manner as said common council shall determine, which said bonds in no case shall be sold for less than their par value.

"SEC. 2. Said bonds shall be denominated bridge bonds, and the proceeds thereof shall be used in defraying the expense of building approaches to and the building of a bridge across the Saginaw river at Genesee street, in the city of Saginaw, county of Saginaw, and State of Michigan, and for no other purposes.

"SEC. 3. Said improvements shall be made and money expended therefor by the board of public works under the direction of the common council." Act No. 446, Local Acts 1899.

Various proceedings were afterwards had by the board of public works and by the common council, and various bids received, and on January 13, 1902, the common council, by unanimous vote, instructed the board of public works to at once advertise "for competitive plans and bids, in accordance with the specifications now on file in the city

engineer's office, for a bridge over the Saginaw river, located at Genesee avenue, in the city of Saginaw, Mich." By the same motion the council recommended the employment of an expert bridge engineer to examine all bids submitted. Pursuant to this resolution, the board of public works advertised for sealed proposals for constructing a bridge at Genesee avenue, and that each bidder be required to furnish with his proposal a complete plan or drawing showing the kind and style of bridge that he intended to construct, and that each bidder be required to deposit with his proposal a certified check on some bank in the city of Saginaw for $3,000, or a bank draft on New York, and that the successful bidder be required to furnish a Fidelity or other surety company bond, in such amount as the board of public works might determine, for the faithful performance of the contract.

The board of public works reported all the bids received by it on February 27th to the common council at a meeting held on the 24th day of March, 1902, recommending that the contract be let to the King Bridge Company for a swing bridge, in accordance with one of its proposed plans, at a cost of $155,475. At this same bidding the defendant National Bridge Company put in a number of bids, including a bid on plan numbered B-2, with the Scherzer Rolling Lift, for $184,000. And at this same meeting of the council there was presented a communication from the board of trade of the city of Saginaw in support of a Scherzer Rolling Lift bridge, which was represented by the following resolution:

" *To the Honorable the Common Council of the City of Saginaw*:

" The following action was taken at a meeting held at the board of trade rooms, Friday, March 21, 1902:

" *Resolved*, that we believe it would be a serious mistake to erect a bridge at Genesee avenue that was recommended by a bare majority of the board of public works at its meeting last evening.

" We believe that this location demands the best and most modern structure now known.

"We believe that the Scherzer Rolling Lift bridge is such a structure.

"Therefore, we request that the common council cause to be constructed at Genesee avenue a modern bridge, with a Scherzer Rolling Lift draw span, at the earliest possible time, believing that by so doing the interests of the city will be best subserved."

This resolution was approved by citizens to the number of 464. The common council rejected the recommendation of the board of public works to let a contract to build a swing bridge. The council then authorized and directed the board of public works to contract with the National Bridge Company in accordance with its plans submitted, including the Scherzer Rolling Lift, at a cost of $184,000, and so notified the board of public works.

Subsequently the contract with the National Bridge Company for a Scherzer Rolling Lift bridge was prepared, approved by the city attorney, executed by the National Bridge Company, and two bonds were presented, signed by the Fidelity & Deposit Company of Baltimore, Md. The plan of the proposed bridge was approved by the Secretary of War. At this point in the proceedings, and on June 26, 1902, the complainant filed this bill to enjoin the defendants from carrying out the proposed contract, alleging that it was illegal and void.

The National Bridge Company made an agreement with the Scherzer Rolling Lift Bridge Company by which it secured the right to use its patent appliance in the construction of this bridge at the agreed price of $6,000. General plans and specifications were made by the city engineer under the direction of the board of public works, and were on file. The engineer also made an estimate of the probable cost, showing it to be $186,500. These plans and specifications contained all the *data* essential for intelligent bidding. The specifications number 151, and cover 31 pages of the record, besides an outline plan of the bridge prepared by the city engineer. There were 58 bids. The American Bridge Company made six different plans and six bids, ranging in price from $149,000 to

$188,000; another submitted three different plans and three bids, ranging from $181,000 to $192,000; another offered thirty plans and thirty bids, ranging from $152,327 to $203,727.

The city engineer testified, in answer to the question why he did not prepare one complete plan, and specifications for one bridge, so that bids could be received on that, —

"Because of an understanding I had that they wanted the widest possible competition, and the general belief that the bridge companies, by submitting their own plans, would give us a bridge which would fulfill the requirements of the specifications, and at less price than, perhaps, we, who are not bridge specialists, could prepare."

There was also testimony that this method of securing bids was quite common, and fully protected the interests of the city.

The case was heard upon pleadings and proofs taken in open court, and the bill dismissed.

*F. E. Emerick* (*L. T. Durand*, of counsel), for complainant.

*Miles J. Purcell*, for defendant National Bridge Co.

*Henry E. Naegely* (*George W. Weadock*, of counsel), for other defendants.

GRANT, J. (*after stating the facts*). The necessity for the construction of a new bridge to replace the old one over the river at Genesee avenue had long been recognized, both by the city authorities and the traveling public. It had been the subject of discussion in the various proceedings of the council for about two years. Plans had been made and submitted to the Secretary of War, and had been rejected. Others were made. The matter was the subject of open discussion. The bridge was finally condemned as unfit for use by heavy teams and street cars. A plan was finally approved by the Secretary of War, and the common council proceeded in accordance with the

authority of the special act, and proceedings were had which resulted in authorizing the contract to be made with the defendant the National Bridge Company.

Fraud is charged in the bill. No claim of fraud or dishonesty on the part of the public officials is made in the briefs of counsel, nor was any made upon the oral argument. This charge, therefore, has failed, and the only questions before the court are questions of law, based upon the undisputed facts of the case.

1. The first question presented is, Does the special act confer independent authority upon the common council and the board of public works to construct the bridge, or is their power limited thereunder by the provisions of the charter? The contention of complainant is that the act is supplementary to the charter, and that, while the act authorizes the construction of the bridge, all the proceedings preliminary to and authorizing a contract for its construction must be in accordance with the charter. The contention of the defendants is that the special act confers authority upon the common council and board of public works to construct the bridge without any reference to the charter provisions. The court below held with the complainant that the special act and the charter must be construed together, but found that the proceedings were regular under the charter provisions. We find it unnecessary to determine whether the special act alone should control, as we agree with the conclusion of the court below that the proceedings are in substantial compliance with the terms of the charter.

Complainant insists that there is a fatal defect, in that section 9 of title 12 of the charter was not complied with. Section 2 of the same title provides that " the board of public works shall, after the said public improvements have been first duly ordered by the common council, have supervision and charge of the construction * * * of bridges," etc. Section 9 provides that, " whenever the common council of said city shall have decided upon the making of any such public improvement, it shall so

132 MICH.—26.

declare by resolution," whereupon the board of public works is required to make an estimate of the materials, cost, expenses, etc. The objection is a technical one at best. We think the various resolutions and proceedings of the common council constitute a sufficient compliance with the charter provisions. The resolution of the common council on February 14, 1898, recited the intention and understanding that an act would be introduced in the legislature at the next session to authorize the issue of bonds to construct the bridge, and directed plans, specifications, and estimates to be made. Other similar resolutions were passed subsequently and acted upon. The legislature, by the special act, recognized the question of a bridge as settled. The decision and determination of the council could not be made to appear more clearly by a formal resolution.

2. The next contention of the complainant is that the method adopted by the council as a basis for bids is illegal. He contends that the common council and the board of public works should have determined exactly upon the character of the bridge proposed to be built, and solicited bids only for one kind of a bridge. He claims that if the council desired the Scherzer Rolling Lift bridge, the draw of which was patented, it should have determined upon that, and solicited bids. Counsel cite, as supporting this proposition, *Cass Farm Co.* v. *City of Detroit,* 124 Mich. 438 (83 N. W. 108); *Moreland* v. *Common Council of Detroit,* 130 Mich. 343 (89 N. W. 935); *McBrian* v. *City of Grand Rapids,* 56 Mich. 95 (22 N. W. 206); and other cases. All of them are, however, cases, as we read them, wherein the charter involved required the contract to be let to the lowest bidder. In such cases the city authorities must determine the kind and character of the bridge, materials, etc. This rule, however, does not apply to cases where the charter does not require the contract to be let to the lowest bidder. *Yarnold* v. *City of Lawrence,* 15 Kan. 126. This is a well-reasoned case by Justice Brewer.

Section 5 of title 6 of the charter provides:

" Whenever any improvement is ordered in any street, except paving, repaving, planking, or macadamizing, the board of public works shall have authority to determine whether such improvement shall be done by the city under the direction and supervision of the board of public works, or whether bids shall be solicited and the improvement be let by contract."

Section 4 of the same title provides:

" The common council shall have the power to cause the common sewers, drains, vaults, arches, and bridges, culverts, wells, pumps, and reservoirs to be built in any part of said city, to cause the grading, raising, leveling, repairing, paving, repaving, repairing, or covering with stone, brick, blocks, plank, or other material any street, avenue, lane, alley, highway, public ground, sidewalk, or crosswalk of said city, but all such improvements shall be done by the board of public works, as herein provided; but no such public improvement shall be made by paving in any way except upon an affirmative vote of two-thirds of all the aldermen-elect, unless a majority of all the property owners having property fronting on the place to be so improved shall have petitioned the common council to make such improvement, in which case a majority vote of the council shall be sufficient to order the same."

Section 9 of title 12 provides:

"The said board of public works shall (except in the case of the cleaning and deepening of ditches and gutters, and the repair of streets and sidewalks) *advertise for proposals*, except as herein otherwise provided, for the furnishing of material and for the performance of such work, and shall require all bidders to furnish security for the performance of proposals tendered to said board if the bid is accepted, and also security for any contract awarded; and all bids submitted to said board shall be publicly opened by it, and, as soon as may be thereafter, reported by the said board, together with its recommendation in respect thereto, to the common council, and no contract shall be let by the said board until it is duly authorized by the common council."

These are the strongest provisions of the charter in regard to letting contracts after advertising. Manifestly

they do not require that contracts must be let to the lowest bidder. It is discretionary with the board, and when it acts in good faith its action is final.

The method adopted by the defendants secured to the city competitive bids both upon plans and cost. See *Attorney General* v. *City of Detroit*, 26 Mich. 263. This view of the case is well stated by the chief engineer of the defendant bridge company, in describing the competition which the plans and specifications invited. He testified:

"The general specifications and Cooper's specifications called for the plans referred to,—call for a definite result; that is, abutments of a certain kind, ornamented in a certain way, balustrades of a certain kind, hand railing of a certain kind, draw span of a certain width located at a certain point, the abutments to begin at a certain point and end at a certain point; the grade not to be higher than necessary, and, if possible, not higher than the old bridge; and the quality of all materials was defined; and any bridge company in figuring upon that would want and naturally be anxious to get the most economical bridge that could be gotten, beauty and strength considered. Now, then, a great many different plans could be gotten, and they would all conform to those certain necessary qualifications; the roadway paving would be a certain kind, the walk and roadway be a certain width, capacity, etc., the roadway and sidewalks and street-car tracks just as called for, and in the location, and as to the height of the roadway, all those things would be the same, and in any case the city would get a thoroughly good bridge."

The complainant gave no testimony that the contract price was excessive. It was, in fact, $2,500 below that of the careful estimate of the city's chief engineer. If the price was unreasonable, or if any *bona fide* offers were made to build the bridge for a considerably less sum, it was open to the complainant to give the proof thereof. Courts do not look with favor upon injunction bills to restrain or hinder the completion of public improvements, unless there is proof of fraud. Such fraud may perhaps be inferred where the price is exorbitant.

3. It is urged that the specifications are not sufficiently definite. The charter, section 9, tit. 12, requires the board of public works to prepare, "*so far as necessary,* plans and specifications for such work or improvement." Its action in this matter is final when its members have exercised their best judgment, and have prepared plans and specifications which bidders can understand and act upon intelligently. The law does not give to courts the power to substitute their judgment for the honest judgment of the board. Only when such board has acted fraudulently, or, perhaps, has ignorantly prepared plans and specifications which are clearly insufficient to form a basis for intelligent and fair bidding, can courts interfere.

4. The authority granted by the board of supervisors, in 1891, to the city to construct a bridge, is sufficient to cover the construction of the present bridge. Where the board of supervisors has once granted such permission, and the bridge is completed in accordance therewith,— *quære,* whether any further permission is required, either to repair the old bridge, or to erect a new one in its stead, so long as all the facilities for the use of the stream and the highway are retained to the public. Moreover, this is a question which does not concern the complainant. So long as the public authorities are content, it is no concern of his whether the supervisors have taken the proper action.

The decree is affirmed, with costs.

The other Justices concurred.