Argued October 20, decided November 1, rehearing denied Dec. 31, 1910.

## KIERNAN v. PORTLAND.*

[111 Pac. 379: 112 Pac. 402.]

CONSTITUTIONAL LAW—CITY CHARTER— AMENDMENT— CONSTITUTIONAL PROVISIONS—SELF-EXECUTING.

1. The Constitution of Oregon, Article XI, Section 2, as amended June 4, 1906, providing that the legal voters of every city and town are granted power to enact and amend their charter, subject to the constitution and criminal laws of the State, is not self-executing, and, in the absence of legislation to the contrary, a city council may, by ordinance, order an initiative measure to be submitted to the voters.

MUNICIPAL CORPORATIONS—CHARTER—AMENDMENT.

2. Where a city charter amendment was on file with the auditor from the time of the presentation of the initiative petition, it was entitled to go on the ballot, whether it be regarded as a measure initiated by petition, or as a measure proposed by the city council.

MUNICIPAL CORPORATIONS—CHARTER AMENDMENT—FILING WITH AUDITOR.

3. Where the general auditor of a city was also city clerk, a charter amendment petition filed with him in one capacity would be regarded as filed in either or both capacities.

MUNICIPAL CORPORATIONS—ORDINANCES—REPEAL.

4. Where a city ordinance appointing an election for an amendment to the city charter was amended by changing the date of the election, and thereafter an ordinance was passed repealing it as amended, the whole ordinance as amended was repealed, at least by implication.

MUNICIPAL CORPORATIONS— CITY CHARTER— AMENDMENT— ELECTION— ORDINANCES.

5. Where a city ordinance as amended, providing for submission to voters of an amendment to the city charter, was repealed, because of supposedly irregularity, the fact that the repealing ordinance did not take

---

*This case has been appealed and is now pending in the United States Supreme Court.        REPORTER.

effect for 30 days did not deprive the council of power to pass a resolution to submit the charter amendment to a vote, at the coming election, before the 30-day period had expired.

STATUTES—INITIATIVE MEASURES—TITLE.

6. Where an initiative measure has a title affixed, the title may be used to identify the measure, though the law does not require a title.

MUNICIPAL CORPORATIONS—CHARTER AMENDMENT—BALLOT.

7. A vote favoring an amendment to a city charter was not rendered invalid because the words "charter amendment submitted by the council" were not printed on the ballot, though the words should have been printed there.

MUNICIPAL CORPORATIONS — CHARTER AMENDMENT — BALLOT — VOTERS' PAMPHLET.

8. A vote in favor of a city charter amendment was not rendered invalid because, in printing the ballot title in the voters' pamphlet, the negative was placed after the even number and the affirmative after the odd, instead of vice versa, as required by law, where in all other respects the ballot title corresponded with that actually printed on the ballot, and the mistake could not have misled the voters.

BRIDGES—CARE AND MAINTENANCE—IMPOSITION ON COUNTY.

9. It is beyond the power of a city to impose the care and maintenance of a public bridge on the county without the county commissioners' consent thereto, and hence a city charter amendment providing for the erection of a public bridge was void in so far as it attempted to impose the care and maintenance of the bridge on the county.

STATUTES—CHARTER AMENDMENT—PARTIAL INVALIDITY.

10. A city charter amendment providing for the erection of a public bridge was not totally void because of an invalid separable provision attempting to impose the care and maintenance of the bridge on the county authorities without their consent.

MUNICIPAL CORPORATIONS—RIGHTS OF TAXPAYERS—OBJECTION TO CONSTRUCTION OF BRIDGE OVER NAVIGABLE STREAM.

11. An objection that no consent of the War Deaprtment had been obtained for the construction of a public bridge over navigable water could not be raised by a taxpayer, but was a matter to be settled between the government authorities and the city.

NAVIGABLE WATERS — BRIDGES — PERMISSION TO CONSTRUCT — PORT OF PORTLAND.

12. Proceedings for the construction of a bridge over the Willamette River by the city of Portland were not invalid because of a failure to obtain permission of the Port of Portland to construct the bridge; such corporation being only authorized to remove obstructions, to deepen the channels, and generally to have control over the river to facilitate and protect commerce.

MUNICIPAL CORPORATIONS—CHARTER AMENDMENT—BRIDGES.

13. Under Constitution of Oregon, Article XI, Section 2, as amended, providing that the legal voters of every city and town are granted power to enact and amend their municipal charters, subject to the constitution and criminal laws of the State, a city, subject to such restrictions, may

include in its charter, by amendment, any provision or right that the legislature might have granted before the constitution was amended, and hence a city by amendment to its charter has a right to locate and construct a public bridge over a river at any point where such river is exclusively within the municipal boundaries.

MUNICIPAL CORPORATIONS — INITIATIVE AND REFERENDUM PROVISIONS — INSTRUCTIONS.

14. The Constitution of Oregon, Article XI, Section 2, as amended June 4, 1906, provides that corporations may be formed only under general laws, but shall not be created by the legislative assembly by special laws, and, further, that "the legislative assembly shall not enact, amend or repeal any charter, or act of incorporation for any municipality, city or town," and that "the legal voters of every city and town are hereby granted power to enact and amend their municipal charter, subject to the constitution and criminal laws of Oregon." *Held,* that the first sentence of Section 2 places no restriction on the legislature as to the enactment of general laws, except that no special laws creating or affecting municipalities shall be enacted by the legislature, the exception reserving to the legislative department the right, whether by the people directly through the initiative, or indirectly through the legislature, to enact general laws on the subject indicating that the inhibition in the next sentence has reference only to special laws.

STATES—"REPUBLICAN FORM OF GOVERNMENT."

15. The term "republican," as used in the federal constitution provision (Article IV, Section 4) guaranteeing to every State a republican form of government, means a government by the citizens *en masse* acting directly, though not personally, according to rules established by the majority.

STATUTES—INITIATIVE AND REFERENDUM PROVISIONS—MUNICIPAL CORPORATIONS—REPUBLICAN FORM OF GOVERNMENT.

16. The Constitution of Oregon, Article I, as amended June 4, 1906, (Section 1*a*), provides that initiative and referendum powers reserved in the people are also reserved to the legal voters of any municipality and district, as to all local, special, and municipal legislation. Section 2 provides that the legal voters of every city and town are granted power to enact and amend their municipal charter. subject to the constitution and criminal laws of Oregon. *Held,* that such provisions did not deprive the State of a republican form of government, in violation of the Constitution of the United States, Article IV, Section 4, in that they were a deprivation of legislative power to enact, amend, or repeal a city charter, or act of incorporation, since the sovereign power to legislate residing in the people may be exercised either directly by the initiative, or referendum, or indirectly by the legislature, without in any way endangering the republican form of government.

COURTS—OPINION—DICTA.

17. Where certain propositions were presented in the briefs of the parties to an appeal and at the oral argument and were considered and decided, the decision would not be rejected as mere dictum, and unnecessary to a determination of the case.

From Multnomah:  GEORGE H. BURNETT, Judge.

Statement by MR. JUSTICE MCBRIDE.

This is a suit by Frank Kiernan against the city of Portland, a municipal corporation, Joseph Simon, mayor of the city of Portland, A. L. Barbur, auditor of the city of Portland, and Joseph Buchtel.

Article V, sections 75 to 92, inclusive, of the city charter, provides the method by which the city of Portland may construct or acquire public utilities, including bridges, but prohibits the city from entering into any contract for such purpose until the question is first submitted to the vote of the electors.

On April 7, 1908, an initiative petition, containing the required number of signatures, was filed with the council, requesting the city to build a bridge across the Willamette River, from Broadway Street in East Portland to the west side of the river, whereupon the city of Portland took steps to obtain plans and specifications for building said bridge. On May 8, 1908, the auditor notified the mayor of the filing of said petition, and requested him to comply with his duties under the charter in regard thereto. On October 20, 1908, the petition, containing a sufficient number of signatures, was presented to the council at a legally called meeting, and at said date the council requested the opinion of the city attorney as to the validity thereof. On October 27, 1908, the attorney filed his opinion, affirming its validity, and thereafter, on November 11, 1908, the council passed an ordinance (No. 18,531) submitting to a vote of the people an amendment to the city charter, providing for the construction of said bridge and for issuing bonds in the sum of not to exceed $2,000,000 to pay for the same, designating said proposed amendment as Section 118½ of Article 7, of Chapter 3, and on November 25, 1908, the council passed a resolution, submitting the proposed amendment to a vote of the people at a special election on April 23, 1909. Thereafter, on February 17, 1909, the council

passed an ordinance (No. 18,976) amending ordinance No. 18,531 so as to fix the date of the election on May 8, 1909, instead of April 23d, as originally specified. On March 31, 1909, the council passed an ordinance (No. 19,174) expressly repealing ordinance No. 18,531 as amended, and no special election was held under any ordinance or resolution. On March 31, 1909, the same date as that of the repealing ordinance, a resolution was passed authorizing the submission of the charter amendment to a vote of the people at the general election to be held June 7, 1909. More than twenty days prior to the election the auditor of the city published the proposed charter amendment, with the ballot in full, in the city's official newspaper, as required by law, and also sent out and distributed copies of said amendment to the voters of the city. On June 7th the election was held, at which there were cast for the amendment 10,087 votes, and against it 6,061, and on June 21st the mayor proclaimed that the amendment had been adopted. On October 27, 1909, the council passed an ordinance (No. 20,208) authorizing the issue and sale of bonds to build the bridge and thereafter plaintiff, a taxpayer of the city, brought this suit to enjoin the sale of such bonds, alleging ordinance No. 20,208 to be void, by reason of the fact that the alleged charter amendment (section 118½) was not properly enacted. Upon trial in the court below the plaintiff's suit was dismissed, and defendant had a decree for costs. Plaintiff appeals.        AFFIRMED.

For appellant there was a brief and an oral argument by *Mr. Ralph R. Duniway.*

For respondents there was a brief with oral arguments by *Mr. Frank S. Grant,* city attorney, *Mr. W. C. Benbow,* deputy city attorney, *Mr. Charles W. Fulton, Mr. Martin L. Pipes* and *Mr. Hayward H. Riddell.*

MR. JUSTICE MCBRIDE delivered the opinion of the court.

1.   Viewed in the light of our constitution and the ordinance of the city of Portland passed in pursuance thereof, the validity of section 118½ of the city charter seems clear.   Article XI, Section 2, of our constitution, as amended June 4, 1906, is as follows:

"The legal voters of every city and town are hereby granted power to enact and amend their municipal charter, subject to the constitution and criminal laws of the state. * *"

In *Acme Dairy Co.* v. *Astoria,* 49 Or. 520 (90 Pac. 153), we held this provision not to be self-executing, and that in the absence of the legislation to the contrary, the city council might, by ordinance, order an initiative measure to be submitted to the voters.   Pursuant to this decision the city council on March 26, 1907, passed ordinance No. 16,311, commonly known as the "McNary ordinance," providing for the submission of iniative measures to the people, and, the present measure having been regularly before them, they passed ordinance No. 18,531, submitting the same and fixing the date for the election on April 23, 1909.   Later, presumably in order to have such special election coincide with the general primary election another ordinance was passed, amending the previous ordinance, and fixing the date on May 8, 1909.   Still later, on March 31, 1909, some doubt having arisen as to the validity of the election on the date last mentioned, an ordinance, repealing the original ordinance as amended, was passed, and at the same meeting a resolution was adopted submitting the amendment to the voters at the general election to be held June 7, 1909.

2.  The McNary ordinance provides that initiative petitions for charter amendments shall be filed not later than the sixtieth day before the election at which they are to be voted on, and also provides that the council itself may submit proposed amendments without an initiative

petition, but that the same shall be filed with the auditor not later than sixty days before the election. The evidence is clear, and is not denied, that the present measure was on file with the auditor from the time of the presentation of the initiative petition, and it would seem clear that whether we regard it as a measure initiated by petition, or as a measure proposed by the council, the requisites of the law as to filing have been substantially complied with, and that the measure was entitled to go upon the ballot.

3. Counsel for plaintiff attempts to draw a distinction —that the original filing was with the auditor acting in his capacity as clerk of the council, and not in his capacity as general auditor and clerk of the city—but no such distinction is made in the law. No good reason exists for requiring several filings of the same paper with the same officer, simply because the duties of his office are divided into several departments. In fact, there is but one office, and one officer with one title, namely, city auditor.

4. The contention that the repealing ordinance of March 31st did not repeal ordinance No. 18,976 is unsound. The ordinance last mentioned did not destroy ordinance No. 18,531, but merely amended it by changing a date from April 23d to May 8th. As amended it was in full force, and when on March 31st an ordinance was passed repealing it "as amended," the whole ordinance, including amendments, was wiped out, if not directly, at least by implication.

5. Nor does the fact that the repealing ordinance could not take effect for thirty days take away from the council the power to pass a resolution to submit the charter amendment to a vote at the June election. They had a right, and it was their duty, to provide for a contingency, which, in the natural course of things, would arise upon

the expiration of the thirty days. Laws predicated upon future contingencies are not unusual.

6. The contention that the resolution submitting the amendment to a popular vote is uncertain and does not identify the amendment, cannot be upheld. We have carefully compared the amendment with the resolution, and are certain that any person capable of reading and understanding the English language would instantly identify them as related to the same subject-matter and to each other. While the law does not in terms require that an initiative measure shall have a title, it does not prohibit a title, and if one is affixed it may be used for the purposes of identification, and in the present case we think the amendment sufficiently identified, both by reference to the title and to the subject-matter.

The alleged differences between the description of the proposed bridge in the resolution and ballot title are too microscopic to have misled any one.

7. Plaintiff also contends that the failure of the auditor to have the words "charter amendment submitted by the council" printed upon the ballot rendered the election void. It may be conceded that these words should have been printed upon the ballot, and that the ordinance requiring this to be done is in a sense mandatory upon the officers charged with the duty of preparing the ballot; but it does not follow that a failure in this respect renders the election void. The omission could have misled nobody, as the important question for the voter to decide was not who introduced the measure, but what its real merits were. Courts should hestitate to disfranchise 10,000 voters because of the neglect of an officer to comply with a technical and comparatively unimportant provision of the law, unless it can be seen that the effect of such negligence might have been to change the result of the election. Following the doctrine above announced,

courts have frequently held statutes, containing provisions similar to the one invoked by plaintiff in this case, to be merely directory as to the voter: *Jones* v. *State,* 153 Ind. 440 (55 N. E. 229) ; *Patton* v. *Watkins,* 131 Ala. 387 (31 South. 93: 90 Am. St. Rep. 43) ; *Maxwell,* Int. Stat. 556, 557.

8. The same answer may be made to the contention that the transposition of the ballot numbers in the voters' pamphlet rendered the whole proceeding void. The law provides substantially that the affirmative shall be designated by the even numbers, and the negative by the odd; but in printing the ballot title in the voters' pamphlet the negative was placed after the even number and the affirmative after the odd. In all other respects the ballot title corresponds with that actually printed upon the ballot. Ordinarily this might be misleading, but in the present case could not possibly be so. We here give the ballot title, omitting that part descriptive of the measure:

Shall article VI, of chapter III, of the charter of the city of Portland be amended by inserting section 118½ ?

| 152 | | | YES. |
|-----|--|--|------|

| 153 | | | NO. |
|-----|--|--|------|

The words "Yes" and "No" were printed in large Roman type, showing much more conspicuously than the figures, and were the very things that indicated to the voter where to mark his ballot. The mistake misled nobody, and was immaterial.

9. It is also urged that the amendment is void because it provides that upon completion of the bridge the executive board shall surrender and deliver the possession thereof to the county court of Multnomah County. We

agree with counsel that it is beyond the power of the city to impose the care and maintenance of a public bridge upon Multnomah County without the county authorities shall consent thereto, and that so far as this clause of the amendment goes, beyond giving a mere permission to do so, it is void.

10. It does not follow, however, that the whole amendment is void merely because one clause, easily separable from the rest, is ineffective: *Simon* v. *Northup*, 27 Or. 487 (40 Pac. 560: 30 L. R. A. 171).

11. The contention that no permission has been obtained from the War Department is negatived by the evidence, and, even if this were not so, the plaintiff does not stand in such a relation to the subject-matter as to be able to raise the question, which is one to be settled between the government authorities and the city.

12. The objection that no permission has been received from the Port of Portland may be answered in the same way: *Kundinger* v. *City of Saginaw*, 132 Mich. 396 (93 N. W. 914).

13. In addition to this, we have been cited to no statute requiring the city to obtain the permission of the Port of Portland before constructing bridges over the Willamette River. This corporation is authorized to remove obstructions, to deepen the channels, and generally to have control over the river for the purpose of facilitating and protecting commerce; but it may well be doubted whether this grant of power was ever intended to authorize it to act as sole judge as to when and where and how a great city shall erect bridges over a waterway exclusively within its own limits. Section 76 of the charter of 1903 authorizes the city to acquire, construct, and maintain bridges and ferries, and this could have no application to any bridges or ferries except over the Willamette River. In the emergency clause to the same charter the necessity for constructing new bridges is

enumerated. The power to construct bridges having been given, the next question is as to the manner of its exercise. The people of this State, by the constitutional amendment heretofore quoted, have seen fit to confer upon municipal corporations the right to enact their own charters; the only limitation upon that right being that such charters shall not conflict with the constitution or the criminal laws of this State. We take it, therefore, that within the limits of the municipality, and for those purposes which are purely municipal, the city of Portland may include in its charter by amendment any provision or right that the legislature might have granted before the constitution was so amended. This being so, there is fair ground for the contention that the city may, by amendment to its charter, obtain the right to locate a public bridge over the Willamette River at any point where such river is exclusively within the municipal boundaries, which is the case here.

We find no error in the record, and the decree of the circuit court is affirmed.        AFFIRMED.

MR. JUSTICE KING delivered the following concurring opinion.

I concur in the conclusion reached by Mr. Justice McBRIDE, and only wish to add that in my opinion there can be no doubt as to the power of the city of Portland to build bridges across the Willamette River without asking the consent of the corporation of the Port of Portland.

The act of legislature of February 18, 1891 (Laws 1891, p. 791, § 2), as amended by act February 18, 1899 (Laws 1899, p. 146, § 1), incorporating the Port of Portland, contains the following grant of power:

"The object, purpose and occupation of said corporation * * shall be to improve the Willamette River at the city of Portland, and the Willamette and Columbia rivers between said city and the sea, so that there shall be made and permanently maintained in said Willamette River

at said city, from wharf line to wharf line, and in the Willamette and Columbia rivers between said city and the sea, a ship channel of such width at any and all points as it may deem necessary. * * So far as is necessary, requisite or convenient to carry out the said objects and purposes, the said corporation shall have the full control of said rivers at said city of Portland and between said city and the sea, so far as and to the full extent that this State can grant the same, and shall have full power to, from time to time, make such rules and regulations for the navigation thereof, or the placing of obstruction therein, as may be requisite, necessary or convenient in the creation or maintenance of such channel. * * Provided always that nothing herein contained shall be so construed as to permit the removal of bridges or other obstructions existing by virtue of grant by this State of express authority thereof. * *"

From the foregoing it will be observed that there is no express provision requiring the city of Portland to apply to the Port of Portland for permission to build bridges at any point within the city's corporate limits. It is too well settled to require citation of authority for support that grants of state sovereignty are always to be strictly construed.

Again, an express reservation as to bridges existing by virtue of an express grant of the State is made in favor of the city in Section 76 of the charter of Portland, authorizing the building of bridges and the maintenance of ferries. In addition to this the constitutional amendment, relating to municipalities (pursuant to which Section 118½ of the charter was adopted) delegates to cities all the legislative powers within their municipal boundaries, so far as that species of sovereignty relates to matters of purely municipal concern. Such grants of legislative power, however, may be recalled by the authority conferring them (*Straw* v. *Harris,* 54 Or. 424: 103 Pac. 777) and this power of recall serves to prevent the abuse of the privilege delegated.

While the Port of Portland is in many of its attributes a municipal corporation, it is one organized for a special purpose, and possessing limited powers, derived, not from the Constitution, but from an express legislative grant. To give to this grant the broad construction claimed by counsel would be to make the Port of Portland virtually master of the city of Portland and responsible to no superior authority. I believe the legislature intended the Port of Portland corporation to be the servant of the city of Portland and of the State at large, in the promotion of commerce and prosperity, and not the dictator thereof.

Running through all the amendments to the Port of Portland act, as well as through the various acts amending the charter of the city of Portland, is an evident intent of the legislature to prevent the rights of the city from being subverted to the wishes of this auxiliary corporation. It follows, then, that the city of Portland, having adopted appropriate amendments to its charter therefor, is acting within the scope of its authority, and is not required to obtain the consent of the Port of Portland before constructing the bridge in question.

AFFIRMED.

Decided December 31, 1910.

ON PETITION FOR REHEARING.

[112 Pac. 402.]

MR. JUSTICE KING delivered the opinion of the court.

14. The principal point suggested by the petition for rehearing is the contention that the people of Oregon have no power by constitutional provision or otherwise, to deprive the legislature of the sovereign power to enact, amend, or repeal any charter or act of incorporation for any city or town, and any attempt so to do is void. The constitutional provisions, amending Article XI, adopted in June, 1906, known as the "Charter Amendments," are as follows:

"Section 1*a*. The referendum may be demanded by the people against one or more items, sections, or parts of any act of the legislative assembly in the same manner in which such power may be exercised against a complete act. The filing of a referendum petition against one or more items, sections, or parts of an act shall not delay the remainder of that act from becoming operative. The initiative and referendum powers reserved to the people by this constitution are hereby further reserved to the legal voters of every municipality and district as to all local, special, and municipal legislation of every character in or for their respective municipalities and districts. The manner of exercising said powers shall be prescribed by general laws, except that cities and towns may provide for the manner of exercising the initiative and referendum powers as to their municipal legislation. Not more than ten per cent of the legal voters may be required to order the referendum, nor more than fifteen per cent to propose any measure, by the initiative, in any city or town.

"Sec. 2. Corporations may be formed under general laws, but shall not be created by the legislative assembly by special laws. The legislative assembly shall not enact, amend, or repeal any charter, or act of incorporation for any municipality, city or town. The legal voters of every city and town are hereby granted power to enact and amend their municipal charter, subject to the constitution and criminal laws of Oregon."

It will be observed from the first sentence in Section 2 that no restriction is placed upon the legislature with respect to the enactment of general laws; the exception being that no special laws creating or affecting the municipalities shall be enacted by the legislature. Under all the rules of construction, this exception reserves to the legislative department the right, whether by the people directly through the initiative, or indirectly through the legislature, to enact general laws upon the subject, making it clear that the inhibition in the next sentence has reference to special laws.

In *Farrell* v. *Port of Portland,* 52 Or. 582, 586 (98 Pac. 145), it is held that the initiative amendments to the con-

stitution, bearing upon the creation and government of municipalities, including Section 1 of Article XI, must be construed together. In considering the effect of Section 2, Article XI, it is there said:

"But this section and the language used in it should not be construed alone. It is a part of the initiative and referendum scheme first inaugurated by the amendment of 1902, and subsequently enlarged and extended by the amendments of 1906. All these amendments, so far as they refer to the same subject-matter, should be read together, and be so interpreted as to carry out the purpose of the people in adopting them, regardless of the technical construction of some of the language used,"

Since the above is the rule regarding the various amendments taken as a whole, much stronger must be the reason for reading and construing together all the sentences in the one section, from which it is obvious that the only restriction placed upon the legislature by Section 2 pertains to the passage of special laws affecting municipalities. These agencies of the State are thereby enabled to enact such local measures, to revise existing local laws, and to exercise their powers affecting them, and thus carry out their general scope and purpose, so long as they are not inconsistent with the constitution of the State, or of the United States, and are in harmony with all the special laws and general laws of the State constitutionally enacted. *Straw* v. *Harris,* 54 Or. 424, 443 (103 Pac. 777.) The language following the above excerpt from page 587 of 52 Or. (98 Pac. 145), of the opinion in *Farrell* v. *Port of Portland,* concerning the limitations placed by the amendment upon the legislature, must be interpreted in the light of the questions there under consideration, from which it is manifest reference was had only to special laws affecting municipalities. The so-termed "general initiative and referendum scheme," there alluded to, and whether it is in violation

of this provision of the federal constitution, is fully considered and determined adversely to petitioner's contention in *Kadderly* v. *Portland,* 44 Or. 118 (74 Pac. 710 : 75 Pac. 222), and *State* v. *Pacific States Tel. & Tel. Co.,* 53 Or. 163 (99 Pac. 427), and there held to be not in conflict or inconsistent therewith.   Other cases impliedly if not expressly sustaining this position are:   *Farrell* v. *Port of Portland,* 52 Or. 582 (98 Pac. 145) ; *Straw* v. *Harris,* 54 Or. 424 (103 Pac. 777) ; *Haines* v. *City of Forest Grove,* 54 Or. 443 (103 Pac. 775) ;   *State* v. *Langworthy,* 55 Or. 303 (104 Pac. 424.)

15. The question, however, as to whether the people may, by constitutional amendment, reserve to themselves the right to enact any law to the exclusion of the legislature, and, by such method, delegate to municipalities powers not subject to abridgment, change, limitation, or recall by special acts of the legislative assembly, was not directly involved in any of the cases above cited.   It would seem, however, that the views and conclusions reached in the decisions named necessarily dispose of this feature, but since counsel for petitioner insists that such disposal has not been made, and presents his contention in good faith, we will, at the possible expense of repetition of views announced in the above cases, consider the points thus presented.   To begin, Article IV, Section 4, Constitution, United States, reads:

"The United States shall guarantee to every state in this Union a republican form of government, and shall protect each of them against invasion; and on application of the legislature, or of the executive (when the legislature cannot be convened), against domestic violence."

In *Luther* v. *Borden,* 7 How. 1, 48 (12 L. Ed. 581), the court observes:

"Moreover, the Constitution of the United States, as far as it has provided for an emergency of this kind, and authorized the general government to interfere in the

domestic concerns of a state, has treated the subject as political in its nature, and placed the power in the hands of that department. The fourth section of the fourth article of the Constitution of the United States provides that the United States shall guarantee to every state in the Union a republican form of government, and shall protect each of them against invasion; and on the application of the legislature, or of the executive (when the legislature cannot be convened), against domestic violence. Under this article of the constitution, it rests with Congress to decide what government is the established one in a state. For as the United States guarantee to each state a republican government, Congress must necessarily decide what government is established in the state before it can determine whether it is republican or not. And when the senators and representatives of a state are admitted into the councils of the Union, the authority of the government under which they are appointed, as well as its republican character, is recognized by the proper constitutional authority. And its decision is binding on every other department of the government, and could not be questioned in a judicial tribunal."

See, also, Cooley, Const. Lim. (6 ed.) pp. 42, 45; *Texas* v. *White*, 7 Wall. 700, 730 (19 L. Ed. 227); *Taylor* v. *Beckham*, 178 U. S. 548 (20 Sup. Ct. 890, 1009: 44 L. Ed. 1187), and 6 Mich. Law Review, 304, where authorities sustaining the above view are collated. We have an illustration of the principles announced in *Luther* v. *Borden* in the admission of Oklahoma as a state. Before its statehood was recognized, Oklahoma had adopted, as a part of its constitution, the initiative and referendum lawmaking system, patterned after the Oregon plan, regardless of which its senators and representatives were "admitted into the councils of the Union," and "the authority of the government under which they were appointed, as well as its republican character, is recognized by the proper constitutional authority," thus determining that state, with its comparatively new legislative system, to be republican in form. This recent historical precedent should in itself

be adequate to set at rest the temporarily mooted question in hand.

This court, however, has heretofore taken jurisdiction of cases of this character (*Kadderly* v. *Portland,* 44 Or. 118 (74 Pac. 710: 75 Pac. 222) ; *State* v. *Cochran,* 55 Or. 157 (105 Pac. 884), and, owing to the importance of the points presented, we will proceed to a consideration thereof. To ascertain whether taking from the legislature and delegating to the municipalities, or to the localities affected, local self-government, or a right to enact, maintain, and alter their charters as the legislature formerly did, and whether the taking from the legislature the right to make special laws upon the subject violates this provision of the national Constitution, makes it important that we first ascertain what is meant by a republican form of government. It is an expression which all assume to understand, yet, judging from the many unsuccessful attempts of eminent statesmen and writers to give it a clear meaning, it would seem the phrase is not susceptible to being given a precise definition. Especially is this true when sought to be applied to the constitution of different states, concerning which Mr. James Madison, a member of the constitutional convention, said:

"* * If we resort for a criterion to the different principles on which different forms of government are established, we may define a republic to be, or may at least bestow that name on, a government which derives all its powers directly or indirectly from the great body of the people, and is administered by persons holding their offices during pleasure for a limited period or during good behavior. It is essential to such government that it be derived from the great body of society, and not from any inconsiderable portion or a favored class of it. * *" *The Federalist* (Hamilton, ed.) paper 39, p. 301.

Another and more pointed definition appears in *Chisholm* v. *Georgia,* 2 Dall. 419, 457 (1 L. Ed. 440), by Mr. Justice WILSON, a member of the constitutional conven-

tion, who, but a short time after the adoption of the federal Constitution, in adverting to what is meant by a republican form of government, remarked:

"As a citizen, I know the government of that state (Georgia) to be republican, and my short definition of such a government—one constructed on this principle, that the supreme power resides in the body of the people."

From which it follows that the converse must be true; that is to say, any government in which the supreme power does not reside with the people is not republican in form. See, also, Mr. Justice WILSON'S remarks to the same effect, reported in 5 Elliott's Debates, 160.

Measured in the light of the above, it is difficult to conceive of any system of lawmaking coming nearer to the great body of the people of the entire State, or by those comprising the various municipalities, than that now in use here, and, being so, we are at a loss to understand how the adoption and use of this system can be held a departure from a republican form of government. It was to escape the oppression resulting from governments controlled by the select few, so often ruling under the assumption that "might makes right," that gave birth to republics. Monarchial rulers refuse to recognize their accountability to the people governed by them. In a republic the converse is the rule. The tenure of office may be for a short or a long period, or even for life, yet those in office are at all times answerable, either directly or indirectly, to the people, and in proportion to their responsibility to those for whom they may be the public agents, and the nearer the power to enact laws and control public servants lies with the great body of the people, the more nearly does a government take unto itself the form of a republic —not in name alone, but in fact. From this it follows that each republic may differ in its political system or in the political machinery by which it moves, but, so long as the ultimate control of its officials and affairs of state

remain in its citizens, it will in the eye of all republics be recognized as a government of that class. Of this we have many examples in Central and South America. It becomes, then, a matter of degree, and the fear manifested by the briefs filed in this case would seem to indicate, not that we are drifting from the secure moorings of a republic, but that our State, by the direct system of legislation complained of, is becoming too democratic—advancing too rapidly towards a republic pure in form. This, it is true, counsel for petitioner does not concede, but under any interpretation of which the term is capable, or from any view thus far found expressed in the writings of the prominent statesmen who were members of the Constitutional Convention, or who figured in the early upbuilding of the nation, it follows that the system here assailed brings us nearer to a state republican in form than before its adoption. Mr. Thomas Jefferson, in 1816, when discussing the term republic, defined and illustrated his view thereof as follows:

"Indeed, it must be acknowledged that the term 'republic' is of very vague application in every language. Witness the self-styled republics of Holland, Switzerland, Genoa, Venice, Poland. Were I to assign to this term a precise and definite idea, I would say, purely and simply, it means a government by its citizens in mass, acting directly and not personally, according to rules established by the majority, and that every other government is more or less republican, in proportion as it has in its composition more or less of this ingredient of the direct action of the citizens." Writings of Thomas Jefferson, vol. 15, p. 19.

It is well known that at the time of the adoption of the federal Constitution there existed in some of the Atlantic states a system of local government, known as "New England towns," in which the people had the right to legislate upon various matters, the masses assembling at stated periods for that purpose, all of which was within the knowledge of those composing the constitutional con-

vention. After observing that a true republic, under his definition, would necessarily be restrained to narrow limits, such as in a New England township, and that the next step in use at that time was through the representative system, Mr. Jefferson pointed out that the further the officials of state or nation are separated from the masses proportionately less does such state or government retain the elements of a republic, and on page 23 concludes:

"On this view of the import of the term 'republic,' instead of saying, as has been said, that it may mean anything or nothing, we may say with truth and meaning that governments are more or less republican, as they have more or less of the element of popular election and control in their composition; and believing as I do, that the mass of citizens is the safest depository of their own rights and especially, that the evils flowing from the duperies of the people, are less injurious than those from the egoism of their agents, I am a friend to that composition of government which has in it the most of this ingredient."

The observations quoted are in full accord with the recorded views of all the writers and statesmen of that time, when the intention of the framers of our national Constitution was fully understood, in the light of which it seems inconceivable that a state, merely because it may evolve a system by which its citizens become a branch of its legislative department, co-ordinate with their representatives in the legislature, loses caste as a republic. The extent to which a legislature of any state may enact laws is, and always has been, one of degree, depending upon the limitations prescribed by its constitution; some constitutions having few and others many limitations. But in all states, whatever may be the restriction placed upon their representatives, the people, either by constitutional amendment or by convention called for that purpose, have had, and have, the power to directly legislate, and to change all or any laws so far as deemed proper—

limited only by clear inhibitions of the national Constitution.  Cooley, Const. Lim. (6 ed.) 44.

16. An examination of our State constitution, as first adopted, discloses many restrictions upon the lawmaking department, among which is a provision to the effect that no amendment thereto should be submitted to the people for ratification until after it passed two consecutive sessions of the legislature.  In course of time, an amendment under this provision was legally submitted and adopted by a majority vote of the people, by which the people reserved the right to change the constitution or any part thereof without awaiting this legislative formality, the validity of which is not open to doubt.  Is it not possible, indeed, is it not practicable, then, for the people further to restrict the power of their representatives to legislate upon matters of public interest, and in so doing are they not, and even under the old system were they not, directly legislating?  This system of direct legislation has been in common use throughout the various state governments since their inception, but until the adoption of the initiative and referendum amendments no one was heard to assert that an amendment to the constitution of a state merely because of depriving the legislature of some lawmaking power or powers held by it at the adoption of the national Constitution, was void on the grounds of being inconsistent with a republican form of government.  The absurdity of such a contention, if made, would at once be obvious.  But, viewed from any standpoint, such is the logical sequence of appellant's contention to the effect, that because the people have, by constitutional amendment, reserved the exclusive right to enact special laws concerning municipalities, and by constitutional amendment have delegated to municipal corporations the right to exercise such powers as before were only within the province of their representatives, through the legislature, to delegate, violates the provision of the

federal Constitution, guaranteeing to our State a republican form of government. In other words, it is argued that the right of the city of Portland to legislate upon matters of municipal concern, to provide for the exercise of its right of eminent domain, to build bridges, etc., would be in harmony with the above provision of the federal Constitution, if delegated by the people through their representatives, but not so if done directly by them through the initiative. In brief, the effect of this argument is that the people may legally do indirectly by the mere enactment of a law what they cannot do directly by constitutional amendment. The statement of this contention should be sufficient for its answer.

We held in *Straw* v. *Harris,* 54 Or. 424 (103 Pac. 777), that a state could not by amendment of its fundamental laws or otherwise, except in the manner provided in Section 3, Article IV, United States Constitution, delegate to any municipal or subdivision of the state prerogatives not subject to recall, that so to do would, in effect, be the creation of a state within a state, and that, so long as the legislature is not precluded by the constitution from enacting general laws affecting them, it may by that method amend, modify, or even abolish municipal corporations, and that even should this power be removed from the legislature there must remain with the people a right to do so, if not by enacting a law to that effect, then by the former system of direct legislation, consisting in the adoption of amendments to the constitution, known as the fundamental laws of the state, and that this right of state government to retain control of these agencies and departments of state cannot be surrendered, but must always remain somewhere within the reach of that source of all power—the people. We held, and still hold, to this view, not on the ground that to hold otherwise would be destructive of a republican form of government, but because to do so would in effect permit a state within a

state and accordingly violate Section 3, Article IV, of the federal Constitution, the first paragraph of which reads:

"New states may be admitted by the Congress into this Union; but no new state shall be formed or erected within the jurisdiction of any other state; nor any state be formed by the junction of two or more states, or parts of states, without the consent of the legislatures of the states concerned, as well as of the Congress."

Suppose our lawmaking department should pass an *ex post facto* act, or a bill of attainder, such purported laws would be void, not because of being subversive of a republican form of government, but by reason of some express inhibition against legislation of that character contained in another section of the federal Constitution. If the national Constitution permitted or provided for the creation of a state within a state, could it be said that by reason thereof the state thus created would be unrepublican in form? Under Section 3 of Article IV, above quoted, states may be divided and new ones created, the limitation being that no state shall be created within a state, but the creation of new states under that section has never been considered an unrepublican step. Should our State attempt to surrender its powers to an executive for life, with the provision that upon his death his authority should pass by entailed inheritance to his son or other relative, and at the same time, by constitutional change or otherwise, further surrender any right to alter the system, except with the consent of such executive, it would lose its republican form, and in effect become a local monarchy within the Union, thereby furnishing an example of a violation of Section 4, Article IV, of the federal Constitution. But, so long as the people retain the power within themselves to conduct and manage the affairs of state—either directly or indirectly—a republican form of government is maintained, and comes within the provision of the federal Constitution guaranteeing the

same, being circumscribed in its powers only by the provisions of such Constitution. The effect of petitioner's contention is that any attempt on the part of the state to enact and enforce a law which may be in conflict with any provision of the national Constitution is not void because in conflict or inconsistent with the special provision violated, but because it deprives the state of its republican form of government, and this seems to be the character of reasoning adopted by the majority in *People* v. *Johnson*, 34 Colo. 143, to which we are cited as sustaining petitioner's view. In that case the question was whether the consolidation of the city and county of Denver, the boundaries of which were made coterminous, abolished the city government, as distinguished from county government, thereby giving to such organization home rule to the extent of permitting it to do as the constitutional amendment of 1902 provided might be done—enact all local laws, and elect such officers at such times as deemed advisable, concerning which it was held by the majority that the city and county governments, although covering the same territory, remained separate and distinct, requiring different officers to be selected for each, and in a different manner, as before the change. The reason for the conclusion appears to be on account of other provisions in the constitution of Colorado, the majority not recognizing the rule invoked without exception in all other jurisdictions, including ours, that constitutions with amendments must be construed as a whole, and that when two constructions are possible, one of which takes away the meaning of a section, and another giving effect to all the provisions, the latter must prevail: *State* v. *Cochran*, 55 Or. 157 (105 Pac. 884) ; *Farrell* v. *Port of Portland*, 52 Or. 582 (98 Pac. 145). In an able and exhaustive dissenting opinion in that case by Mr. Justice STEELE, concurred in by Mr. Justice GUNTER, it is made clear that a federal question (such as here presented)

was not involved; that the 1902 amendment of Colorado's constitution was not inconsistent with Section 4, Article IV, of the federal Constitution. After demonstrating that the conclusion announced by the majority "overlooks the fundamental rule in the construction of constitutions and statutes that a special provision controls the general one and that both may stand * *" (*People ex rel. Atty. Gen.* v. *Johnson,* 34 Colo. 189, 193 (86 Pac. 233, 249), at the close of his opinion (page 193) it is observed:

"Wherever the question has been presented, the courts have given effect to the wishes of the people and sustained the power to establish the form of government here provided as not being in violation of the federal Constitution, and not in excess of the powers of the people to so provide in their organic law. And it is to be regretted that this court felt in duty bound to undo the work of the charter convention and to deny the people of this city and county the right to provide for a simple and economical plan of government as directed by the constitution."

Our holding is that the State may, by constitutional provisions, directly delegate to municipalities any powers which it, through the legislature, could formerly have granted indirectly. All the prerogatives attempted to be exercised by Portland in the construction of the Broadway bridge, formerly could have been granted by the legislature, and the power to provide therefor, having been delegated to the city by amendment to our organic laws, is valid, and the right to exercise such powers will continue until such time as changed by general enactments of the lawmaking department of our State, provision for which may be made by the legislature by general laws, applying alike to all municipalities of that class, or by the people through the initiative, by the enactment of either general or special laws on the subject: Cooley, Const. Lim. (6 ed.) 41, 45; *Hopkins* v. *Duluth,* 81 Minn. 189 (83 N. W. 536); *In re Pfahler,* 150 Cal. 71 (88 Pac.

270: 11 L. R. A. (N. S.) 1092); *Ex parte Wagner,* 21
Okl. 33 (95 Pac. 435); *State* v. *Field,* 99 Mo. 352 (12
S. W. 802); *Kansas* v. *Marsh,* 140 Mo. 458 (41 S. W.
943); *Kadderly* v. *Portland,* 44 Or. 118 (74 Pac. 710:
75 Pac. 222); *State* v. *Pacific States Tel. & Tel. Co.,* 53
Or. 163 (99 Pac. 427); *Straw* v. *Harris,* 54 Or. 424 (103
Pac. 777); *City of McMinnville* v. *Howenstein,* 56 Or. 451
(109 Pac. 81).

17. In a public address prepared by Hon. Frederick
V. Holman, attached to and filed as an appendix to peti-
tioner's brief, it is argued that our previous holding in
*Hall* v. *Dunn,* 52 Or. 475 (97 Pac. 811: 25 L. R. A.
(N. S.) 193), and *Straw* v. *Harris,* 54 Or. 424 (103 Pac.
777), to the effect that we have but one lawmaking
department, composed of two separate and distinct law-
making bodies—(1) the people, acting directly through
the initiative; and (2) the people acting indirectly
through the legislature—either of which in a manner
provided by law may undo the work of the other, and
necessarily must lead to disastrous results, etc., in that
an act passed by the first may immediately on the con-
vening of the legislature be repealed, and one enacted
by the legislative assembly may also be rescinded through
either the initiative or the referendum. But that objec-
tion applies only to the question of expediency, with
regard to which the lawmakers, and not the courts, are
concerned. It might not be inappropriate, however, to
observe that the same objection may with equal force
apply to all legislative bodies. Our legislature to convene
next week can, if it so chooses, repeal all the laws (not
included in constitutional amendments) enacted at the
recent November election, and also undo the work of the
last legislative assembly. Again, two years later or
earlier a special session of the legislature might be called,
and enact many laws, and the day following its adjourn-
ment the newly elected legislature could be convened and

repeal all the laws going into effect the preceding day. The same may also be said of Congress, but this is seldom, if ever, urged as an argument against a representative system, or alluded to as indicating that our government is becoming unrepublican in form. In the appendix mentioned, it is observed that under our system, as interpreted by this court, we have four legislative bodies in place of two: (1) The legislature; (2) the people of the whole State; (3) the people of a municipality; (4) the common council or commissioners. This suggestion, however, overlooks the fact that in the above-cited cases advertence was made only to legal departments of the State, and not to municipal or other minor and *quasi* legislative bodies. The fallacy of this illustration (like many others to which our attention is directed, and which will not be specifically discussed) is obvious. The observation to the effect that under the interpretation given by this court to the charter amendments cities may invade the domain of state legislation to the extent, if desired, of condemning state property (such as capitol buildings, etc.), has no justification, either in the language of the charter amendments, or in anything said in any opinion of this court in interpreting such amendments. Many of the statements in our former opinions bearing upon points here presented are adverted to as dictum, and like contention is also made respecting our holding in the case at hand, to the effect that it is unnecessary to obtain the consent of the Port of Portland before the bridge in question may be construed. The points decided, determining the status of the Port of Portland in the matter, were all forcibly presented in the briefs and at the oral argument, and the effect of the conclusion reached by this court was that, taking either horn of the dilemma, appellant's position is untenable. It cannot, therefore, be said that our views upon either point are dicta, and the same may be remarked of much, if not all, of the num-

Sig 16

erous like references to previous adjudications by this court (as in *Straw* v. *Harris* and other cases) in which the views alluded to as dicta hold adversely to the wishes and contention of the writers of petitioner's brief, and the appendix thereto. On what is dicta and the effect thereof see *Kirby* v. *Boyette,* 118 N. C. 244, 254 (24 S. E. 18) ; *Buchner* v. *C., M. & N. W. Ry. Co.,* 60 Wis. 264 (19 N. W. 56) ; *Kane* v. *McCown,* 55 Mo. 181; *Ocean Beach Ass'n* v. *Brinley,* 34 N. J. Eq. 438 (26 Am. & Eng. Ency. Law (2 ed.) 165, 171; *Florida Cent. Ry. Co.* v. *Schutte,* 103 U. S. 118, 143 (26 L. Ed. 327). The terms "obiter dicta," "dictum," etc., like the phrase "technicalities of the law," are too often invoked by counsel to express disapprobation of some proposition of law militating against their contention.

Numerous other points are presented upon which the views of this court are requested. Some of them, however, were disposed of in our former opinions herein, to which we still adhere, and those remaining, even though not specifically adverted to, are included in the above considerations.

The petition for rehearing is denied.

AFFIRMED: REHEARING DENIED.