Argued and submitted May 12, 2000, affirmed January 23, 2002

GTE NORTHWEST INCORPORATED,
a Washington corporation,
*Appellant,*

*v.*

OREGON PUBLIC UTILITY COMMISSION,
Roger Hamilton, Ron Eachus and Joan H. Smith,
Commissioners;
Lincoln County, a political subdivision of the State of
Oregon;
and Economic Development Alliance,
an Oregon non-profit corporation,
*Respondents.*

98C-19114; A106560

39 P3d 201

James M. Brown argued the cause for appellant. With him on the briefs was Enfield Brown Collins & Knivila.

Jas. Jeffrey Adams argued the cause for respondent Oregon Public Utility Commission. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Rob Bovett, Assistant County Counsel, argued the cause and filed the brief for respondent Lincoln County.

No appearance for respondent Economic Development Alliance.

Before Edmonds, Presiding Judge, and Armstrong and Kistler, Judges.

EDMONDS, P. J.

Armstrong, J., concurring.

## EDMONDS, P. J.

Plaintiff GTE brought this action in circuit court pursuant to ORS 756.580. Plaintiff sought to have the court set aside findings and conclusions of law made by the Oregon Public Utility Commission (PUC). The trial court held for defendants, and plaintiff appeals. We affirm.

The Economic Development Alliance of Lincoln County (Alliance) and Lincoln County filed separate applications for authority to provide telecommunication services. The applications were consolidated for consideration by the PUC. The final amended applications sought approval to provide interexchange service in Lincoln, Lane and Douglas Counties. According to the applications, applicants sought to be resellers of a data communication service that will use a fiber optic network system. The network system will utilize fiber optic strands and equipment contributed by Alliance and Lincoln County and will provide the means to transport communications. Plaintiff filed a protest to the applications. PUC granted the applications, designating Lincoln County as a provider of the transmission service in Lincoln, Lane and Douglas Counties.

On appeal, plaintiff makes two assignments of error. First, it argues that Lincoln County lacks authority to engage in competitive economic activities with other telecommunication service providers within Lincoln County. Alternatively, it argues that Lincoln County lacks authority to provide competitive telecommunication services beyond its geographical boundaries. The county in response, relies on ORS 203.035 for that authority, which provides, in pertinent part:

"(1)   Subject to subsection (3) of this section, the governing body or the electors of a county may by ordinance exercise authority within the county over matters of county concern, to the fullest extent allowed by Constitutions and laws of the United States and of this state, as fully as if each particular power comprised in that general authority were specifically listed in ORS 203.030 to 203.075.

"(2)   The power granted by this section is in addition to other grants of power to counties, shall not be construed to

limit or qualify any such grant and shall be liberally construed, to the end that counties have all powers over matters of county concern that it is possible for them to have under the Constitutions and laws of the United States and of this state."

When interpreting a statute to discern the legislature's intent, we first examine the text and context of the statute. Subsection (1) of the statute authorizes the governing body of the county to "exercise authority within the county over matters of county concern" to the fullest extent allowed by law. Subsection (2) provides that "counties have all powers over matters of county concern that it is possible for them to have" under the law. Neither party points us to a statutory or constitutional provision that expressly restricts the county's purported authority as a telecommunication service provider. However, plaintiff argues that competitive economic activity by a county with the private sector is generally beyond the authority historically granted by the legislature to counties. The county counters that, in 1973, the Oregon Legislature granted counties "statutory home rule" powers. Under that grant of authority, the county has acted to enhance economic development within Lincoln County by developing a communications network. We agree that the grant of authority in ORS 203.035 is broad and, on its face, is limited only by the phrase "matters of county concern." However, it is not evident from the text or context what activities the legislature contemplated would constitute "matters of county concern." We turn to the legislative history for more guidance.

ORS 203.035 was enacted in 1973, and the scope of its language, especially the phrase "matters of county concern," has remained essentially the same since that date. Or Laws 1973, ch 282, § 2.[1] House Bill 3009 (1973), which ultimately became ORS 203.035, was proposed by the House Local Government and Urban Affairs Committee and by the Association of Oregon Counties. The perceived need, according to Steve Orrick of the Association of Oregon Counties, was to fundamentally alter the scope of a county's authority

[1] *See also* Or Laws 1981, ch 140, § 1; Or Laws 1985, ch 756, § 1; Or Laws 1995, ch 712, § 87.

to act. Tape recording, House Committee on Local Government and Urban Affairs, HB 3009, March 26, 1973, Tape 14, Side 2 (statement of Steve Orrick). He explained that, under then-existing law, a county was presumed to be unable to take any given action unless it could find a specific, enumerated power somewhere in the statutory framework that bestowed the specific power. Otherwise, counties were limited to the exercise of specifically delineated powers that the legislature conferred by statute. *Id.*

At the time, there were numerous opinions of the Attorney General, and several older cases, that had strictly construed a county's authority. *See, e.g., Powell Grove Cem. v. Multnomah Co.*, 228 Or 597, 365 P2d 1058 (1961); *Fales v. Multnomah County et al*, 119 Or 127, 133, 248 P 151 (1926). Such a framework had resulted in an overwhelming number of requests by specific counties during each legislative session for the legislature to grant new, enumerated powers that would allow a county to act in specific situations. Tape recording, House Committee on Local Government and Urban Affairs, SB 3009, March 26, 1973, Tape 14, Side 2.

Orrick testified that the purpose of the bill was to "reverse" the status quo or, in other words, to reverse the presumption of lack of authority and to grant counties the authority to act without seeking express legislative approval. The proposed change would place the onus on the legislature to circumscribe the county's authority by specific legislation. *Id.* Orrick gave two examples. He explained that, in most counties, there was a pressing need for transportation services for the elderly but that private entities were not willing to provide the service. He explained that, under then-existing statutes, counties did not have an enumerated grant of authority to offer transportation services, so they could not perform that function. He stated that the bill, if adopted, would give counties that power because transportation for the elderly was clearly a matter of county concern. He also explained that the bill would allow counties to impose a hotel/motel tax if desired, which they did not have the legislature's specific statutory authorization to do. He explained that the bill was intended to be prospective and to confer powers, which the legislature could then limit after the fact, if it wished to make a matter one of statewide concern. *Id.*

Another legislator expressed the concern that the legislature might prefer to have counties come to it and ask for specific authority in each instance, rather than granting blanket authority. Orrick acknowledged that the legislature would still retain the ability to limit a county's exercise of power under the proposed bill but that the presumption would be in favor of the county's exercise of its power in the absence of legislative action. Orrick then discussed the interaction between home rule counties, chartered counties, and the proposed statute.[2] *Id.* He concluded by saying that the bill was not a new attempt to enumerate powers at all but was intended to be broad and sweeping; no one would know what powers had been conferred under the bill until a specific challenge to a county's exercise of power was tested in court. *Id.* While there was extensive additional discussion about whether a county should have the ability to tax and produce revenue without legislative approval, the general terms of HB 3009 regarding "matters of county concern" were adopted without much additional comment. SB 3009 was enacted in 1973 in substantially the same form in which it was proposed.

In *Allison v. Washington County*, 24 Or App 571, 581, 548 P2d 188 (1976), we addressed the issue of the 1973 Legislature's intentions in enacting ORS 203.035. We said:

"ORS 203.035 (which became law via Oregon Laws 1973, ch 282) obliterates most distinctions between the powers of general law counties and home rule counties. Home rule counties derive their legislative power from Art. VI, s[ection] 10 of the Oregon Constitution and from their individual charters. Art. VI, s[ection] 10 grants home rule counties authority 'over matters of county concern.' General law counties derive their legislative power from specific statutory grants and from the broad general [statutory] grant in ORS 203.035 of authority 'over matters of county concern.'

_____

[2] Orrick explained that the proposed legislation would differ from a county charter because a charter encompasses two powers: the ability to let people reorganize their local government and the ability to enact ordinances. He stated that the proposed legislation would affect only the second power—the ability to enact ordinances. He explained that it differed from home rule because the legislature is powerless to change a home rule county's charter, but that, under the new legislation, the legislature would have the power to control the counties through legislation that would override the decisions made by the people in a home rule county.

General grants of power to counties convey exactly that broad grant articulated therein, except that which is preempted by state law. *Schmidt v. Masters*, 7 Or App 421, 429, 490 P2d 1029 (1971), [*rev den*] (1972). Therefore, in the absence of state preemption or a limiting charter provision, home rule and general law counties have the same legislative authority." *Allison*, 24 Or App at 581 (footnote omitted).

Based on that understanding, we articulated the test that informs the analysis in this case. We said that the distinction to be drawn under ORS 203.035 was whether the proposed action "is a matter of predominantly statewide or predominantly local concern." *Allison*, 24 Or App at 584.

After we issued our opinion in *Allison*, the 1981 Oregon Legislative Assembly repealed a host of statutes that gave counties specific authority to do a variety of things, including the authority to grant and revoke dance hall licenses, to provide for the maintenance and employment of paupers, to build and maintain roads to public cemeteries, and to grant paid vacation and sick leave to county employees. *See, e.g.,* Or Laws 1981, ch 41, § 3 (repealing ORS 203.122, ORS 203.123, ORS 203.124, ORS 203.125, ORS 203.130, ORS 203.140). Those statutes had become superfluous because ORS 203.035 granted counties plenary legislative powers in those areas as well as other "matters of county concern."[3]

■    With that history in mind, we turn to the questions presented here. The first question is whether Lincoln County can operate a telecommunication service within its own boundaries. The answer turns on whether the provision of telecommunication services in the county is predominantly a matter of local, or instead, state concern. *See, e.g., Boytano v. Fritz*, 131 Or App 466, 477, 886 P2d 31 (1994), *aff'd* 321 Or 488, 901 P2d 835 (1995) (employing a "predominant character" test).[4] As shown by the record in this case, the county's

---

[3] *See also* Orval Etter, *County Home Rule in Oregon Reaches Majority*, 61 Or L Rev 3, 13-16 (1982).

[4] The concurrence criticizes our statutory analysis on the basis of the reasoning in *La Grande/Astoria v. PERB*, 281 Or 137, 576 P2d 1204 (1978). In that case, the cities brought declaratory judgment proceedings challenging the constitutionality of state statutes requiring counties to provide state retirement system

interest is in the economic development of the county and the surrounding region and in the provision of services that are commonplace in other areas of the state—internet access, high speed telephone connections, and internal county communication between the schools, libraries and other county offices. While the broad availability of communication services is a state concern, as evidenced by the state's own enactment of statutes regarding the provision of such services, *see, e.g.*, ORS chapter 759, the concern about telecommunication service for residents of Lincoln County is a more specific concern of the county than of the state. Moreover, we perceive no prohibitions in ORS 203.035 as contemplated by the legislature that would prohibit a county service from competing with the private sector. We conclude that, under ORS 203.035, Lincoln County is authorized to provide telecommunication services to its own residents, even if that means that the county is competing with plaintiff.

We turn to the second issue, which is whether Lincoln County can lawfully operate its telecommunication service outside its boundaries. Again, we are not aware of any statutory prohibition on the county's exercise of its authority outside its boundaries. The legislative history underlying ORS 203.035 explains that, in the absence of such a constraint, the county has the authority to act regarding "matters of county concern." Plaintiff argues that such a broad interpretation of ORS 203.035 would conflict with Article VI, section 10.[5] It asserts, "The statute upon which [the county]

---

membership for city police and fireman and life insurance policies for police and firemen. As *La Grande/Astoria* makes clear, there are four types of situations that may be encountered in that area of the law: (1) municipal enactments in the absence of state law, (2) municipal enactments in conflict with state law, (3) state laws in the absence of municipal enactments, and (4) state laws that conflict with municipal enactments. 281 Or at 141-42. *La Grande/Astoria* is a case presenting the third or fourth type of situation. The test for those situations is "whether the challenged law is addressed primarily to a concern of the state with the modes of local government or to substantive social, economic or other regulatory objectives." 281 Or at 149.

Unlike the statutes in *La Grande/Astoria,* here there is no statewide attempt to constrain the counties' authority under Article VI, section 10, of the Oregon Constitution. The inquiry is whether the county's own enactment is valid, which presents a question under the first or second category. Thus, the test used in such an inquiry is unaffected by the constitutional considerations that prompted the decision in *LaGrande/Astoria.*

[5] Article VI, section 10, provides, in part:

relies, ORS 203.035, is a statute only. [The county] cannot claim that the Oregon Constitution has changed. The enactment of a statute cannot alter the fundamental nature of Oregon's counties." It relies on the proposition that, within Article VI, section 10, there are implied constitutional limitations on the matters that will be deemed to be of "county concern." However, we perceive nothing in the language or in the previous interpretations of Article VI, section 10, that would limit the county's ability to exercise its authority beyond its boundaries, and plaintiff does not refer us to any previously articulated constraints. Rather, the language of ORS 203.035 tracks the language of Article VI, section 10, and such services cannot be said to be *ultra vires* if the provision of telecommunication services outside the territorial boundaries of the county is a matter of county concern.

Generally, the understanding of when a local governmental entity can act lawfully outside its territorial boundaries is well-settled in the case law. In *State ex rel v. Port of Tillamook*, 62 Or 332, 124 P 637 (1912), the Supreme Court held that the municipal port of Tillamook had no authority to expand its own geographical boundaries outward into an area of land where residents were not able to vote on their annexation into the port. It said:

> "[s]uch municipal authority to act upon local matters should be exercised with due regard to the right of adjoining · localities, and in harmony with the general plan of home rule. If a municipal corporation is permitted to extend its boundaries, step by step, indefinitely, without the sanction of the State or the people of the districts included in the extensions, it would be subversive of the very plan as expressed by the people in their sovereign power through

"The Legislative Assembly shall provide by law a method whereby the legal voters of any county, by majority vote of such voters voting thereon at any legally called election, may adopt, amend, revise or repeal a county charter. *A county charter may provide for the exercise by the county of authority over matters of county concern.* * * * A county charter shall prescribe the organization of the county government and shall provide directly, or by its authority, for the number, election or appointment, qualifications, tenure, compensation, powers and duties of such officers as the county deems necessary. * * * The initiative and referendum powers reserved to the people by this Constitution hereby are further reserved to the legal voters of every county relative to the adoption, amendment, revision or repeal of a county charter and to legislation passed by counties which have adopted such a charter[.]"

the ballot, and not a reasonable exercise of the power conferred." *Port of Tillamook*, 62 Or at 342.

Then the court, in *Churchill v. Grants Pass*, 70 Or 283, 141 P 164 (1914), examined whether a municipality had the power under the Oregon Constitution to construct and operate a steam railroad within and without the boundaries of the city. The court first determined that the nature of municipal corporations in relationship to the state is that they are "mere agencies" that the state may "control * * * even to the extent of amending their charters." *Churchill*, 70 Or at 288. The court then said:

"That certain attributes of the sovereignty of the state may be delegated to such corporations necessarily must be true. * * * There is nothing in our constitution which prohibits the state from building and owning a railroad; in fact, such a road built and owned by the state has been in operation at Celilo on the Columbia River for many years. What the state may do in this respect, it may lawfully delegate to any of its municipal corporations; and the only question is whether the proposed legislation is for a public purpose." *Id.*

The court concluded that construction of the railroad was a public purpose and that the rule "would seem to cover all cases of railroad construction by municipalities, whether wholly within the boundaries of such municipality or not, if the purpose of such improvement is for the general welfare, convenience, health or comfort of its citizens." *Id.* at 288-89.

In *State v. Port of Astoria*, 79 Or 1, 17-20, 154 P 399 (1916), the court first adopted the nomenclature of "intramural" and "extramural" power. It stated,

"Powers exercisable by cities and towns may be placed in two separate classes, which, for the sake of brevity and the want of better terms, will be designated as: (1) Intramural; and (2) extramural. When the legal voters of a city enact municipal legislation which operates only on themselves and for themselves, and which is confined within and extends no further than the corporate limits, then such voters are exercising intramural authority. When, however, the legal voters of a city attempt to exercise authority beyond the corporate limits of their municipality, they are using an extramural power.

"* * * * *

"The legal voters of cities and towns are not obliged to look to the legislature for the right to exercise any intramural power; but the whole sum of intramural authority is set at large, and the legal voters may exercise all of that authority or only such part of it as they may desire, subject, of course, to the Constitution and criminal laws of the state, and subject also to the right of the people of the commonwealth to amend charters or enact supervisory legislation by the use of the initiative: *Robertson v. Portland*, 77 Or 121[, 149 P 545 (1915)]. Extramural authority, however, is not available to the legal voters of cities and towns, unless the right to exercise it has first been granted either by a general law enacted by the legislature or by legislation initiated by the people of the whole state. The right to employ intramural authority finds its source in the language of the Constitution, because the legal voters of cities and towns are by that instrument expressly empowered to enact and amend their own charters; but permission to employ extramural authority must be granted to cities and towns before the privilege can be exercised. One power coexists with the Constitution, while the other power does not exist at all, unless the people of the whole state either grant the authority themselves by the initiative or extend the privilege through their representative, the legislature. * * * Precedents have firmly established the rule that extramural power cannot be employed by cities and towns unless a law exists permitting it, and some prior adjudications have advanced a step further, and held that a general law enacted by the legislature permitting the exercise of extramural power does not by its own force ingraft that power upon the charter of a city, but the general law may be likened to a continuous offer of a power which nevertheless cannot be used until the legal voters of the city have accepted the offer by amending their charter so as to include the proffered power." *Port of Astoria*, 79 Or at 17-20 (citations omitted).

In *Richards et al. v. City of Portland et al.*, 121 Or 340, 255 P 326 (1927), the plaintiffs, who lived outside Portland, sought to force the city to continue providing water service to their residential area outside the city. The court undertook an analysis of whether the city had authority to become a public utility and concluded that it did not. It then reasoned that, because the city could not lawfully have

become a public utility provider, it could not be compelled to provide the water services. Later cases have been careful to distinguish *Richards* from other cases involving a municipality's authority, clarifying that *Richard's* holding was not that the city was not authorized to provide water outside its boundaries but instead that it could not be compelled to do so. *See, e.g., Yamhill Elec. Co. v. City of McMinnville*, 130 Or 309, 339-40, 274 P 118 (1929), *cert den* 280 US 531 (1930).

In *Yamhill Elec. Co.*, the court evaluated the question of whether the city of McMinnville could be enjoined from extending its city power lines to provide power to a golf course several miles outside the city. The court took care to distinguish between policy decisions on the part of a city and constitutionally permissible exercises of its delegated authority. The court said:

> "Consequently, while there is no constitutional inhibition against the state building and operating a railroad, say, from Portland to Ashland, such an enterprise would find small favor[.] * * * What the state can do in this regard, we see no constitutional objection to its authorizing its municipal corporations, which are mere agencies of the state, also to do in such cases as it shall deem proper." *Id*. at 324.

It continued:

> "It is further contended by plaintiff that, even conceding that municipalities are authorized to operate plants for the production and sale of electrical energy outside as well as inside their municipal boundaries, they have no authority to *deliver* such energy outside their corporate limits; that they may convey such energy only to the boundary and deliver it there into agencies furnished by the consumer and not otherwise. The consumer must bring his 'bucket' and have it filled at the city boundary." *Id*. at 333.

The court then addressed that argument by looking to the terms of the city's own charter, and, finding language that allowed the delivery and sale of electricity to the city and its "vicinity," the court concluded that the city's authority authorized the power line extensions. *Id*. at 337.

In *City of Salem v. O.-W. Water Serv. Co.*, 144 Or 93, 23 P2d 539 (1933), the issue was whether the city could provide water service to residents living outside of the city

boundaries. The court concluded that, the city's charter authorized the city to sell water from the city's water system "within or without the limits of such incorporated city or town * * * and to make contracts in reference to the sale and disposal of water * * * for use within or without the corporate limits." *Id.* at 117. The court looked first at the municipal charter, which clearly purported to bestow "extramural" authority on the city, and then looked to the statutes which authorized such charter provisions. The court said that

> "the validity of these statutes [authorizing such charters] has been affirmed. They do not themselves amend municipal charters, but merely constitute an offer by the state to any municipality which desires to avail itself of these extramural powers. * * * It is evident from the foregoing that by the enactment of section 90 the city did not confer upon itself extramural power, for it could not do so, but merely accepted the offer of such power submitted to it in the above two sections of our laws." *City of Salem*, 144 Or at 117-18 (citations omitted).

We presume that the 1973 Legislature was aware of those decisions when it enacted the broad grant of authority contained in ORS 203.035. From those decisions comes an understanding that a municipality's exercise of its authority outside its boundaries depends not on territorial boundaries but on the nature of the extramural activity. That understanding exists in other contexts. For instance, in *DeFazio v. WPPSS*, 296 Or 550, 679 P2d 1316 (1984), the issue was whether the cities had the authority under their respective charters and the constitution to enter into agreements for the construction and the operation of nuclear power plants. The court said:

> "One of the arguments made by the opponents and accepted by the circuit court is that the agreements involve an 'extramural' exercise of municipal power for which cities need authority from the state as well as from their own charters. They cite cases of an earlier generation that recited this rule in general terms, although the decisions rarely invalidated the particular activity in issue. *See, e.g., City of Salem v. O.-W. Water Serv. Co.*, 144 Or 93, 23 P2d 539 (1933) (sale of city water outside the city authorized by law and charter); *Yamhill Elec. Co. v. City of McMinnville*,

*supra*, 130 Or 309, 274 P 118 (1929) (same for sale of electricity)[.]

"\* \* \* \* \*

"A broad generalization that a city has no 'power' or 'authority' beyond its borders does little to explain what constitutes an exercise of 'power' or 'authority.' It does not explain, for instance, why these terms apply to a city's sales of goods or services outside its borders more than to its purchases. Nor is it always clear whose interests the rule is meant to protect, that of the citizens who have authorized the city's action or that of the surrounding governmental entities and their inhabitants. Possibly the early opinions reflect concern about competitive encroachments by municipal enterprises or private business more than legal analysis. *See, e.g., Yamhill Elec. Co., supra.* Perhaps also the installation of permanent city facilities, even if accomplished by ordinary 'proprietary' transactions, may sometimes represent an extension of the city's presence beyond its borders that should be authorized by the state rather than only the city's own citizens. *See, e.g., Riggs v. Grants Pass*, 66 Or 266, 134 P 776 (1913). Primarily, however, the concept of 'extramural power,' power 'outside the walls,' is relevant when a city undertakes to assert *coercive authority* over persons or property outside its boundaries. It has little relevance to a city's contracts or other *consensual transactions* in goods or services, although an exercise of eminent domain outside city limits, for instance, would be an exercise of extramural power." *DeFazio*, 296 Or at 582-83 (emphasis added).

We have also followed the distinction between *coercive authority* and *consensual transactions* in later cases. In *City of Eugene v. Nalven*, 152 Or App 720, 955 P2d 263, *rev den* 327 Or 431 (1998), the city brought suit, asking the court to compel a property owner who lived outside the city to connect to the city's sanitary sewer system. The city had a charter provision allowing it to compel sewer connections for noncity residents under very limited circumstances, but the city relied instead on a new ordinance that purported to authorize the city to compel any structures located within 160 feet of the city's jurisdiction to connect to the city's sewer. We said:

"A city generally may exercise authority only within its corporate limits. The sole exception to that general rule is that a city may exercise authority outside its boundaries when a jurisdiction from which it draws its power to act—a county or the state—grants it that authority. Thus, for example, a city cannot levy a special assessment district that includes land outside the city limits, unless a statute confers on that city the authority to do so.

"That exception to the general rule has been qualified further by a requirement that any grant of extramural authority be 'clearly expressed.' As the Supreme Court explained in *Richards et al v. City of Portland et al*, 121 Or 340, 345, 255 P 326 (1927):

" 'It is elementary that a municipality, acting either in its governmental or proprietary capacity, can do so only by virtue of express or implied authority conferred upon it. Ordinarily, the jurisdiction of a municipality ceases at its boundaries and for it to exercise extraterritorial jurisdiction its powers to do so must be clearly expressed.' *City of Eugene*, 152 Or App at 724-25 (citations omitted).

"We concluded:

"* * * [n]one of the city's arguments supports its ultimate conclusion that it has statutory authority merely to declare by ordinance that property located outside of its municipal boundaries must connect to its sewage disposal system. None of the statutes on which it relies grants it such extraterritorial authority. At the very least, those statutes are reasonably capable of more than one construction and do not satisfy the 'clearly expressed' grant of extramural authority that the law requires. *Richards*, 121 Or at 345." *Id.* at 731 (citations omitted).

Finally, in *State v. Logsdon,* 165 Or App 28, 995 P2d 1178, *rev den* 330 Or 362 (2000), this court again addressed the interaction between the intramural and extramural exercises of a municipality's authority. The voters of Josephine County had enacted an amendment to their charter that, in effect, made it unlawful for state and county law enforcement officials to perform searches and seizures in Josephine County without a court order or consent of the owner. The first question we addressed was whether the voters had

authority to enact such a provision. We concluded that they did not. In our discussion, we said:

"The pertinent provision of the constitutional grant of authority permits county charters to provide for the exercise of authority over 'matters of county concern.' Neither the constitution nor the implementing statutes define the term, however. We have noted that the grant of authority to counties in Article VI, section 10, is an adaptation of city home rule provisions and that, in consequence, 'the authority of a county under a home rule charter may be as broad as that of a city.' *Schmidt v. Masters*, 7 Or App 421, 428, 490 P2d 1029 (1971), *rev den* (1972).

"Although the perimeters of city and county home rule authority may defy easy delineation, certain qualifications of that authority may be stated with some confidence. In particular, it is well established that, whatever else local government authority may entail, it does not include governing the conduct of state and federal officials. *See, e.g., Multnomah County v. $5,650 in U.S. Currency*, 309 Or 285, 289, 786 P2d 729 (1990) ('The fact that a county acts under a home rule charter does not mean that it can call upon the state courts to enforce ordinances or otherwise to exercise their jurisdiction in any case that the county wishes.'); *La Grande v. Municipal Court et al.*, 120 Or 109, 114-15, 251 P 308 (1926) (cities cannot alter jurisdiction or function of state courts); *Kiernan v. Portland*, 57 Or 454, 463, 111 P 379 (1910), *error dismissed* 223 US 151, 32 S Ct 231, 56 L Ed 386 (1912) (home rule entities may not regulate other governmental units); *Lines v. City of Milwaukie*, 15 Or App 280, 286, 515 P2d 938 (1973), *rev den* (1974) (home rule city does not have authority to alter the jurisdiction of state courts).

"In this case, section 29.4 of the Josephine County Charter, by its terms, purports to govern the conduct of any 'public official,' whether elected or appointed, and 'any agent of the government.' Indeed, it declares that no one—no 'individual, group, or federal, state or local governmental body or agency'—may enforce any law that is contrary to section 29.4. No county has the authority to do that. Section 29.4 goes well beyond any matter that legitimately may be regarded as a 'county concern.' It follows that section 29.4 is invalid and that the trial court did not err in so concluding and, on that basis, in denying defendant's motion to suppress." *Logsdon*, 165 Or App at 32-33.

■    To summarize, the county's authority is circum-
scribed by the constitution and by ORS 203.035. From the
statute comes a clear, express grant of authority that
requires only a demonstration of a concern that is peculiar to
the county's residents. Here, the record demonstrates that
the county's concern is to provide a telecommunication serv-
ice that benefits its residents by facilitating communications
along the coast. Its residents have interests outside the
county's territorial boundaries, not unlike the interests
involved in *Churchill, Richards, Yamhill Elec. Co., City of
Salem,* and *DeFazio*. Also, its residents have an interest in
the jobs generated and the attraction of new businesses that
may occur because of enhanced telecommunication services
along the coast. As importantly, Lincoln County does not
seek to compel the residents of Lane and Douglas counties to
use its telecommunication lines by the exercise of its
authority.

We conclude that Lincoln County is acting within its
statutory and constitutional authority in using the telecom-
munication network to offer voluntary telecommunication
services in Lane and Douglas counties and it is legally irrel-
evant that those services may compete with plaintiff. It fol-
lows that the trial court did not err in ruling that the PUC
was authorized to issue the certificates of authority to permit
Lincoln County and the Alliance to provide those services.

Affirmed.

**ARMSTRONG, J.,** concurring.

I agree with the majority's decision to affirm the
Public Utility Commission (PUC) order that authorized
Lincoln County to provide competitive telecommunication
services. I disagree, however, with the reasoning that the
majority uses to reach that decision. The effect of its decision
is to resurrect an understanding of the legislative authority
of local governments that the Supreme Court rejected in
1978. The majority errs in doing that.

The majority implicitly concludes that ORS
203.035,[1] the statute on which the county relies for its

---

[1] ORS 203.035 provides, as relevant:

authority to provide competitive telecommunication services, is ambiguous, because the majority relies on legislative history to determine the meaning of the statute. *See* 179 Or App at 49-53. We are not supposed to use legislative history in interpreting a statute without first concluding that the statute is ambiguous. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-11, 859 P2d 1143 (1993). In order to conclude that a statute is ambiguous, we must identify at least two plausible interpretations of it, based on the statute's text in context. The majority does not identify two plausible interpretations of ORS 203.035, so I question whether it should look to the legislative history of the statute to interpret it.

Assuming that the legislative history of ORS 203.035 bears on the interpretation of the statute, the majority misinterprets that history. The history establishes that the legislature sought to give counties that rely on statutes for their legislative authority the same authority to enact legislation that counties operating under home rule charters can have.[2] Consistently with that goal, the legislature wrote ORS 203.035 to give statutory counties the broadest possible authority to enact legislation on any matter of county concern, so that it would not be necessary for them to return to

"(1) Subject to subsection (3) of this section, the governing body or the electors of a county may by ordinance exercise authority within the county over matters of county concern, to the fullest extent allowed by Constitutions and laws of the United States and of this state, as fully as if each particular power comprised in that general authority were specifically listed in ORS 203.030 to 203.075.

"(2) The power granted by this section is in addition to other grants of powers to counties, shall not be construed to limit or qualify any such grant and shall be liberally construed, to the end that counties have all powers over matters of county concern that it is possible for them to have under the Constitutions and laws of the United States and of this state."

[2] Article VI, section 10, of the Oregon Constitution gives counties the authority to adopt home rule charters. It provides, as relevant, that the

"Legislative Assembly shall provide by law a method whereby the legal voters of any county, by majority vote of such voters voting thereon at any legally called election, may adopt, amend, revise or repeal a county charter. A county charter may provide for the exercise by the county of authority over matters of county concern. * * * The initiative and referendum powers reserved to the people by this Constitution hereby are further reserved to the legal voters of every county relative to the adoption, amendment, revision or repeal of a county charter and to legislation passed by counties which have adopted such a charter * * *."

the legislature to seek specific authority to legislate on a particular subject.

At the time that the legislature adopted the statute in 1973, the Supreme Court had interpreted the Oregon constitutional provisions on local home rule as allocating lawmaking power between the state and local governments. *See State ex rel Heinig v. Milwaukie et al*, 231 Or 473, 479-85, 373 P2d 680 (1962). Under that interpretation, local home rule governments were understood to have lawmaking authority on subjects that were more a matter of local concern than of state concern. *See id.* at 479-88. Legislators predictably spoke in terms of that interpretation when discussing the intended effect of the legislation that became ORS 203.035, which was to give statutory counties the same legislative authority as home rule counties.

Five years after the enactment of ORS 203.035, the Supreme Court in *LaGrande/Astoria v. PERB*, 281 Or 137, 576 P2d 1204, *adhered to on rehearing* 284 Or 173, 586 P2d 765 (1978), dramatically altered its interpretation of local home rule authority. Under the new, and current, interpretation of that authority, the constitutional provisions are *not* understood to allocate substantive policy-making authority between the state and local governments. That means that the lawmaking authority of local home rule governments does *not* depend on whether the subject of the local legislation is more a matter of local concern than of state concern. *Id.* at 145-57. That means, in turn, that home rule charters can give local governments considerably broader authority to enact legislation than previously believed, because that authority is not limited to subjects that are more a matter of local than state concern.

The majority essentially rejects that change in the law as applicable to counties that operate as statutory rather than as home rule counties. In its view, the legislature intended ORS 203.035 to give statutory counties the legislative authority that home rule counties were understood to have when it enacted the statute in 1973, rather than the authority that the Oregon Constitution actually gives home rule counties. Consequently, statutory counties operating under ORS 203.035 do not have legislative authority that is

coextensive with the authority that is available to home rule counties.

I do not believe that that is what the legislature intended. It adopted ORS 203.035 to give statutory counties legislative authority that is equivalent to that available to home rule counties under Article VI, section 10, of the Oregon Constitution. The text of the statute does that. The statute should not be interpreted narrowly to codify the interpretation that applied in 1973 to the authority available to home rule counties under Article VI, section 10. That means that, contrary to the majority's view, the legislative authority of statutory counties such as Lincoln County should be evaluated according to the current interpretation of Article VI, section 10, which means that the county's authority does not depend on whether the provision of telecommunication services in Lincoln County is more important to the county than the state. *Compare* 179 Or App at 52-53.

I have little difficulty rejecting GTE's arguments that ORS 203.035 does not give Lincoln County the authority to provide competitive telecommunication services. According to GTE, ORS 203.035 does not give counties authority to provide services other than those that counties have historically provided. In its view, the services historically provided by counties consist of "appraisal, tax collection, law enforcement, courthouses, records and roads." If counties want to provide other services, they have to get specific authority from the legislature to do so. In summary, although counties may be concerned about the adequacy of services such as water, sewer, electricity, and telecommunications that are provided to their residents, ORS 203.035 does not give them the authority to address that concern by providing those services.

If GTE's argument were correct, then it would mean (1) that ORS 203.035 implicitly distinguishes between the power of counties to regulate activities and their power to provide services or (2) that the statute grants counties very little power. The issue of domestic water service for county residents can help illustrate the point.

ORS 203.035 gives counties "all powers over matters of county concern that it is possible for them to have." ORS

203.035(2). It would appear that the cost and quality of domestic water provided to county residents would be a matter of concern to counties. If water cost and quality are matters of "county concern," as that term is used in ORS 203.035, then counties presumably have the power to enact ordinances to regulate companies that provide domestic water service or to give the companies tax incentives to enable them to improve their water systems. According to GTE, however, counties historically have not provided water service to their residents, so ORS 203.035 does not give them the authority to provide that service. It follows, therefore, that there must be an implicit distinction in ORS 203.035 between the power of counties to regulate matters of county concern and their power to provide services regarding those matters.

Conversely, if the statute does not distinguish between the power to regulate and the power to provide services, then domestic water service cannot be a matter of county concern, because the inability of counties to provide domestic water services would imply a concomitant inability to regulate companies that do provide those services. That would mean that matters of county concern would have to be construed narrowly to cover only those matters that come within the historic range of activities undertaken by counties.

I reject both propositions. The legislature enacted ORS 203.035 to give counties that have not enacted home rule charters the ability to exercise all powers over matters of county concern that counties with home rule charters can exercise. By doing that, the legislature made it unnecessary for counties to seek specific authority from the legislature to address the concerns that they have.[3] Although there are limits to the county concerns on which ORS 203.035 gives counties authority to act, I have no doubt that economic

---

[3] *See, e.g.,* Orval Etter, *County Home Rule in Oregon Reaches Majority*, 61 Or L Rev 3, 13-16 (1982). The enactment of ORS 203.035 ultimately led the 1981 Oregon Legislature to repeal a whole host of statutes that gave counties specific authority to do a variety of things, including the authority to grant and revoke dance hall licenses, to provide for the maintenance and employment of paupers, to build and maintain roads to public cemeteries, and to grant paid vacation and sick leave to county employees. *See* ORS 203.120 to ORS 203.125, ORS 203.130, ORS 203.140 (1979).

development and the availability and cost of high-speed tele-communication services are matters of county concern under the statute.

Because economic development and telecommuni-cation services are matters of county concern, counties that are subject to ORS 203.035, such as Lincoln County, have all the power to address those matters that Oregon counties can have. Contrary to GTE's view, that power includes the power to provide telecommunication services in competition with private businesses that provide the same services. Earlier in our history, private companies built toll roads to provide the means for people to move around the state,[4] and nothing pre-vents them from doing that now. It may not be economically feasible for them to do that in competition with state and local governments, but there is no principle that makes road construction a governmental rather than a private activity. Similarly, there is no principle that makes the provision of telecommunication services a private rather than a govern-mental activity. I therefore reject GTE's contention that counties lack authority under ORS 203.035 to provide telecommunication services in competition with private companies.[5]

GTE also argues that, if ORS 203.035 gives counties the authority to provide telecommunication services, then that authority does not extend beyond county boundaries. In its view, it cannot be a concern of counties to conduct activi-ties beyond their borders. I reject that proposition as well.

Under ORS 203.035(1), a county may "exercise authority within the county over matters of county con-cern[.]" The effect of that language is to impose a geographic restriction on the exercise of coercive governmental power by counties. That means, for example, that counties cannot use the authority granted them by ORS 203.035 to impose taxes

---

[4] *See, e.g.*, Or Laws 1872, p 35 (act to aid Trask River Road Co. to enable it to complete a toll road from Tillamook County to the Willamette Valley).

[5] The authority granted to counties by ORS 203.035 is subject to state and fed-eral law. *See* ORS 203.035. That means that state and federal law preempt any con-flicting county ordinances enacted pursuant to ORS 203.035. GTE has not argued that Lincoln County's decision to provide telecommunication services conflicts with any state or federal law, and I am not aware of any such conflict.

on property located outside their boundaries or to regulate activities that occur outside their boundaries.

That does not mean, however, that counties are restricted from using the authority granted them by ORS 203.035 to engage in activities beyond their boundaries. If the statute imposed such a restriction, then it would mean that a county could not send its employees outside the county to get training or to purchase supplies, it could not purchase advertising to tout its economic or scenic appeal to people outside the county, and it could not go outside the county to recruit employees. The statute does not impose such a restriction. Counties can use the authority granted them by ORS 203.035 to engage in activities beyond their boundaries if the activities involve a matter of county concern and are of a type in which anyone else might engage, such as purchasing goods and services, purchasing or selling property, etc. *Cf. DeFazio v. WPPSS*, 296 Or 550, 582-83, 679 P2d 1316 (1984) (discussion of extramural authority in context of municipal home rule).

The activities at issue in this case are of the latter type. Central Lincoln PUD (Central Lincoln) operates in Lincoln, Lane, and Douglas Counties. The telecommunication services that Lincoln County and its partners provide are furnished in Central Lincoln's service area using Central Lincoln's telecommunication network. I have already concluded that the county has authority under ORS 203.035 to operate that network, and the operation of the network is something in which anyone could have chosen to engage. I conclude, therefore, that Lincoln County is acting within its authority under ORS 203.035 to use Central Lincoln's telecommunication network to provide competitive telecommunication services in Lincoln, Lane, and Douglas counties. It follows that the PUC did not err in issuing certificates of authority to permit Lincoln County and its partners to provide those services. I therefore concur in the majority's decision to uphold the PUC order that granted those certificates.